

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | CASE NO. 9:16-CR-15(4) |
| § | |
| DANIEL HOWARD § | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court, Eastern District of Texas, the District Court referred this matter to the undersigned magistrate judge for a hearing and the submission of findings of fact and a report and recommendation on the defendant's *First Motion to Suppress Evidence Seized by Harris County Deputy Sheriffs on March 30, 2016 in Harris County, Texas.* [Clerk's doc. #98].

### I. Procedural Background

On April 27, 2016, Daniel Howard, along with his co-defendants Bryan Swoveland, David Mudry, Erik Rodriguez, and Ramiro Camacho, were charged by a Criminal Complaint which alleged that on or about March 2, 2016, in Houston County, in the Eastern District of Texas, they intentionally and knowingly conspired and agreed with each other and with others known and unknown to the grand jury to distribute and possess with the intent to distribute a Schedule II controlled substance, namely methamphetamine, in violation of Title 21, United States Code,

-1-

Section 846 [Clerk's doc. #1].

A federal grand jury subsequently indicted Howard and his co-defendants on May 4, 2016. [Clerk's doc. #15]. Count 1 of the Indictment charged the defendants with conspiracy to distribute and possess with the intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 846.

On August 10, 2016, Howard filed his *First Motion to Suppress Evidence Seized by Harris County Deputy Sheriffs on March 30, 2016 in Harris County, Texas.* [Clerk's doc. # 98]. According to Howard, he was driving a 2007 Ford F-250 pickup on or about March 30, 2016, in Harris County, Texas. Officers pulled him over, ordered him to exit his vehicle, patted him down, placed handcuffs on him, and placed him in the back seat of the patrol car. Howard refused to provide consent to search his vehicle and, according to Howard, the officers searched the vehicle and recovered two package which were later determined to contain methamphetamine. Howard argues that the officers involved did not have a warrant to search his vehicle or to arrest him. Howard contends that the search and seizure was in violation of his rights under the Fourth Amendment to the Constitution. This Court conducted hearings in the matter on August 30, 2016 and on September 1, 2016.

II. <u>**Testimony and Evidence Presented at the Suppression Hearing**</u>

    A.    **The Surveillance During the Controlled Purchase of Narcotics at a Motel in Harris County, Texas**

On March 30, 2016, officers and agents assigned to the Multi-Agency Gang Task Force were conducting a controlled purchase of narcotics at a motel located in Harris County, Texas and had the motel under surveillance. The task force is composed of state and federal law enforcement

officers from Harris County, Texas. Deputy Nickolas Parojcic with the Harris County Sheriff's Department was assigned to the task force and was on duty during the operation. A few hours before the operation, Deputy Parojcic met with a Harris County Sheriff's Department patrol sergeant and asked him if he could provide the task force with a marked unit to perform a traffic stop if one was needed during the controlled purchase. The sergeant provided Deputy Parojcic with the contact information for Deputy Nathan Gonzales. Deputy Parojcic met with Deputy Gonzales and advised him that agents were doing a controlled buy in a narcotics investigation and may need a marked unit to do a traffic stop if needed.[1] In addition, Deputy Parojcic had also called Deputy Daniel Cline (a K-9 handler) and advised him that a narcotics investigation was being conducted; a traffic stop would probably be executed, and asked that Deputy Cline be in the area if needed.

During the subsequent controlled purchase operation, Officer Ricardo Guzman from the Houston Police Department (also assigned to the task force), was conducting surveillance at the motel. Officer Guzman sat in his vehicle in the parking lot of the motel and watched for individuals leaving Room 122. Subsequently, Officer Guzman was notified by other officers that an individual may be leaving that particular room in possession of narcotics. The individual was described as a white male with a pony tail, wearing a baseball cap. Officer Guzman observed the individual (subsequently identified as Defendant Daniel Howard) exit Room 122, cross the parking lot, and approach a silver Ford truck, which had dark tinted windows and was missing a tail gate. According to Officer Guzman, Howard walked to the driver's side door and leaned in to put

---

[1] Deputy Parajcic did not provide Deputy Gonzales with details of the operation. He basically informed him that there was a narcotics investigation taking place and that officers in undercover vehicles were conducting surveillance in the area. According to Deputy Parajcic, it was up to the patrol officer (Deputy Gonzales) to develop probable cause for any proposed traffic stop which may subsequently take place.

something down inside of the vehicle. Howard then went to the passenger side door and stood on the side railing fumbling with the roof area/visor area of the inside of the vehicle. Finally, Howard then went back to the driver's side door and then drove off in the truck. Deputy Guzman radioed this information about Howard and the truck to other officers. He did not attempt to follow the truck for fear of being spotted by Howard.

FBI Special Agent Stacy Mamasis was also conducting surveillance that day during the operation. She received information by other officers that the pickup had pulled out of the motel parking lot and would be passing her location. Mamasis pulled out behind the pickup on FM 1960 and followed it on the highway for approximately two miles until it reached IH-45. She noted that the pickup was driving the posted speed limit on FM 1960 at that time. However, she noted that the pickup sped up as it traveled northbound on IH-45, going above the posted speed limit.[2]

While parked behind a restaurant near the motel, Deputy Parojcic was advised by others on the surveillance team that there had been a person interacting with people involved in the investigation and that this "subject in play" was driving a large F-250, possibly a F-350, silver pickup which was missing a tailgate. Deputy Parojcic followed the pickup to confirm that it was the described vehicle. He then radioed Deputy Gonzales, telling them that the truck was "in play" and for him to catch up to it and develop probable cause for a traffic stop.[3] Deputy Gonzales was told that the driver of the pickup was suspected of having narcotics and that the vehicle needed to be stopped.

---

[2] She did not "pace" the pickup to confirm the speed of the pickup and did not have radar in her unmarked car.

[3] He advised Deputy Gonzales that the truck in question was a large silver or gray F-250 with dark "limo tint" on the windows of the vehicle and that it was missing a tailgate.

## B. The Traffic Stop

Deputy Gonzalez spotted the pickup traveling northbound on IH-45, caught up to it, and followed behind it, "pacing" the pickup at 70 mph in a posted 65 mph zone.[4] Gonzales also noticed that the pickup had very dark tinted front passenger and driver's windows. However, because Gonzales was unable to conclusively determine that the tint was illegal, he relied on the speeding violation for probable cause to effectuate the traffic stop.[5]

Deputy Gonzales activated his emergency lights and Howard pulled over into the parking lot of parking lot of a night club.[6] Deputy Gonzales approached the driver's side of the pickup and his partner (Deputy Sergio Torres) approached the passenger side. Deputy Gonzales asked Howard for his driver's license and Howard responded that he did not have it on him but that he did have a valid driver's license.[7] Howard stated that he did not have any form of identification except credit cards with his name on them. Gonzales explained to Howard why he had been pulled over and Howard responded that he was just keeping up with the flow of traffic and asked what the speed limit was. According to Deputy Gonzales, Howard seemed very nervous in that he was shaking and his lip was quivering.

---

[4] Deputy Gonzales initially determined that the pickup was traveling 72 mph in a 65 mph zone, but the pickup then slowed to 70 mph in the 65 mph zone. The patrol unit was equipped with radar but Deputy Gonzales did not utilize it.

[5] Gonzales testified that officers later concluded that the tint was illegally dark.

[6] The traffic stop and subsequent search of the vehicle was recorded by a dash camera mounted in Deputy Gonzales' patrol car. The DVD was admitted into evidence during the hearing as Government's Exhibit #1. According to the time stamp, Gonzales activated his emergency lights at 8:45 p.m., Howard pulled over, and the encounter was initiated at 8:47 p.m.

[7] Deputy Gonzales had not been previous provided with the identity of Howard by any of the other officers conducting the controlled purchase operation.

While Howard was sitting behind the wheel of the pickup, Deputy Gonzales noticed a small black bag on the driver's seat next to Howard. The bag was open and Gonzales recognized it to be a "gun bag" that is used to carry firearms when they are transported to places such as a gun range. Deputy Gonzales asked Howard to step out of the pickup because Howard had no identification and also because Deputy Gonzales thought that there may be a firearm in the bag. As Howard exited the pickup he advised Gonzales that there was a pistol in the bag.

Deputy Gonzales advised Howard that he was not being arrested but was being detained. Deputy Gonzales then handcuffed Howard.[8] As Howard was explaining why he did not have a driver's license in his possession, Gonzales asked him why he was shaking. Howard denied being nervous and was placed in the rear of Gonzales' patrol car.

Deputy Gonzales asked Howard his name and Howard gave him his correct name. Gonzales then asked Howard if he had ever been arrested before and he admitted that he had been arrested in the past. Gonzales immediately began to check the Harris County criminal database system. According to Deputy Gonzales, the Harris County criminal database is a database that provides dates of arrests and punishment imposed for individuals who have been arrested in Harris County, Texas. It also provides a mug shot of the person whose name is queried so that an officer may positively confirm that the person he is currently questioning has provided him the correct name. Gonzales testified that he uses this system, instead of the driver's license system, to identify people he is questioning who do not have a driver's license with them because, in his experience, people

---

[8] Deputy Gonzales testified that it was departmental policy to handcuff an individual who was being detained. Deputy Gonzales stated that this was done for officers' safety because there was a gun in the vehicle, the identity of Howard was still unknown, and because of the danger of an unrestrained person being in the back seat of the patrol car while the officer is in the front seat performing the required computer checks. The video reflects that Howard was handcuffed at 8:49 p.m., two minutes into the traffic stop.

will memorize others' names and license numbers and give them to a questioning officer. Although Howard gave Deputy Gonzales his name and driver's license number on several occasions during their brief conversation, Gonzales did not immediately run a driver's license check on Howard and chose instead to use the Harris County database to attempt to verify Howard's identity. Gonzales testified that he cannot input a person's name and driver's license number and obtain their photograph; he only gets a physical description. In addition, the Harris County criminal database system informs officers if there are pending warrants.[9]

While the two men sat in the patrol car and Gonzales waited for the response, Howard stated that the pickup truck did not belong to him, but that he had possession of the truck to get the windshield replaced. Gonzales asked Howard if there was anything in the vehicle that "he [Howard] should not have." Howard replied that there was not. At 8:52 p.m., Howard again told Gonzales that he knew his driver's license number. Gonzales replied, "Ok, I'll look it up that way."

While Deputy Gonzales was in the patrol unit with Howard, Torres checked the tint of the driver's side window of the pickup truck. Gonzales then talked to one of the other officers and told Howard that the tint on the front was too dark and was not within the legal limits.[10]

At 8:54 p.m., Deputy Gonzales asked Howard for consent to search the pickup. Howard stated that he could not give permission because he was not the owner of the truck. Gonzales advised him that as an operator of the truck he could give permission. However, Howard refused

---

[9] It appears that Deputy Gonzales began this computer check at 8:50 p.m., which is three minutes after Howard was stopped.  I

[10] At this time it was 8:53 p.m. A photograph of the tint meter with the reading obtained at the scene was introduced into evidence as Government's Exhibit #2. Deputy Torres testified that he was able to observe the dark tint on the pickup prior to the traffic stop and had concluded that it was too dark.

– 7 –

to give consent to the search.

Deputy Gonzales then asked for Howard's driver's license number and Howard gave it to him once again at 8:55 p.m. Howard's driver's license returns seconds later.[11] Attempting to ascertain if there was insurance on the truck, Gonzales asked Howard who the owner was. Howard provided the name at 8:58 p.m.. Deputy Gonzales asked Howard if there was insurance on the vehicle (Howard was unable to provide proof of insurance) and Howard replied that there was.[12] Howard complained to Gonzales that he didn't do anything wrong. In response, Gonzales advised Howard that it was important that he (Gonzales) determine Howard's true identity because "at the end of the day you take off running on me and I don't catch you, I don't know who you were." Gonzales asked Howard, "you said that you have been to jail before right, sir?"[13] Howard responded that he had, but not for a felony. Gonzales replied that he was trying to find Howard in the Harris County database but could not find his jail information. Howard then told that he had not been to jail in Harris County and Gonzales replied that this was the reason he could not find him in the Harris County criminal database. Gonzales then performed a more expanded search through NCIC/TCIC which gives information about arrests occurring in other Texas counties and other states.

Meanwhile, Deputy Torres, upon being informed that Howard refused consent, called Deputy Cline and asked him to come to the scene. Deputy Cline arrived on the scene at 9:01 p.m.,

---

[11] However, it did not provide a photograph which Deputy Gonzales testified that he wished to have to positively identify Howard.

[12] At 8:58 p.m., Deputy Gonzales received an "extended license plate check return" which verified that there was insurance on the pickup.

[13] This occurred at 9:01 p.m.

accompanied, by his certified drug detection dog "Jack," and began walking Jack around the truck. While Deputy Cline was doing this, Deputy Gonzales finally found Howard in NCIC/TCIC stating, "Yeah, see, I found you." [14]

Approximately three minutes later, the dog alerted at the front passenger door seam and also at the driver's side door.[15] After the dog alert, deputies began searching the pickup. During the search, Deputy Gonzales located a baggie containing suspected methamphetamine between the center console and the passenger seat. Deputy Cline located a second baggie, also containing suspected methamphetamine in the same location.

### III. Argument of the Parties

Howard contends that the initial stop for speeding was improper and that Deputy Gonzales illegally extended the traffic stop by searching for him in the Harris County database system and NCIC/TCIC. Howard argues that Deputy Gonzales could have run the driver's license check, immediately determined his identity, and concluded the traffic stop. The Government responds that the initial stop of Howard's vehicle was proper and any detention of Howard beyond that necessary to effectuate the purpose of the traffic stop was supported by reasonable suspicion of additional criminal activity.

### IV. Law and Analysis

#### A. The Applicable Law on Traffic Stops

The Fourth Amendment protects individuals "against unreasonable searches and seizures."

---

[14] The time was 9:03 pm. Deputy Gonzales testified that the criminal history check came back "clear" and it would be at this time that he would normally begin the process of issuing a citation for speeding, not having a driver's license, not having proof of insurance, and illegal window tint.

[15] Both alerts occurred at 9:06 p.m.

U.S. CONST. AMEND. IV. Traffic stops are deemed seizures for the purposes of the Fourth Amendment. *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001). The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *See Knowles v. Iowa*, 524 U.S. 113, 117, 119 S. Ct. 484, 142 L. Ed.2d 492 (1998); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed.2d 317 (1984). Under the two-part *Terry* reasonable suspicion inquiry, we ask whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868.

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005), *cert. denied* 546 U.S. 1222 (2006). "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed.2d 621 (1981)). The Fifth Circuit has stated that reasonable suspicion exists when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *See, e.g., United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvisu*, 534 U.S. at 274, 122 S.Ct. 744. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry*, 392 U.S.

at 27, 88 S.Ct. 1868. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. *Arvizu*, 534 U.S. at 274.

Recently, in *United States v. Spears,* 636 F. App'x 893, 898 (5th Cir. 2016), the Fifth Circuit succinctly set forth the analysis for determining the existence of reasonable suspicion:

> Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the ... seizure. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level of probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. The reasonable suspicion analysis is necessarily fact specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. We must pay heed to the Supreme Court's admonition not to treat each factor in isolation, and instead must consider the totality of the circumstances and the collective knowledge and experience of the officer. Under the collective knowledge doctrine, reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation.

(quotations and citations omitted).

As for the second prong of the *Terry* inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop ..." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004)(en banc). In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. *Id.* at 507-8. An officer may also ask the driver about the purpose and itinerary of his trip. *Id.* at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop since "[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed." *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)). Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion,

and, as a general matter, continued questioning thereafter prolongs the detention. *Brigham*, 382 F.3d at 510; *see also Santiago*, 310 F.3d at 341-42; *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000); *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999). A recognized exception to that rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *See Brigham*, 382 F.3d at 507; *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003), *cert. denied* 540 U.S. 1227 (2004).

**B.      Was the initial stop of Howard's vehicle justified by reasonable suspicion?**

As stated above, "for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno,* 420 F.3d 430 (5th Cir. 2005). However, even if a traffic violation has not been committed, an officer may stop a vehicle for investigatory purposes if he or she has a reasonable suspicion of criminal activity. *United States v. Zavala,* 541 F.3d 562, 574 (5th Cir. 2008).

Although Deputy Gonzales was informed that Howard's vehicle may contain illegal narcotics, he was instructed to develop his own justification for stopping Howard's vehicle. The Government does not argue that the initial stop should be justified because of reasonable suspicion that Howard was involved in a narcotics offense at the motel, but instead relies on the two traffic offenses (speeding and illegal tint) to justify the stop of the pickup truck.

As stated above, Deputy Gonzales testified that he paced Howard's vehicle at 70 mph in a 65 mph zone. The Court finds testimony credible and it is bolstered by the testimony of FBI Special Agent Stacy Mamasis who testified that she also observed the pickup speeding as she followed it

on IH-45. Howard argues that Gonzales could not have sufficiently "paced" his vehicle due to the fact that he almost immediately activated his emergency lights as he caught up to the pickup truck.

This Court disagrees. A close review of the video indicates that Deputy Gonzales followed behind Howard for several seconds and paced the pickup. In addition, it appears that Howard's pickup traveled in excess of the 65 mph speed limit for several seconds even after Deputy Gonzales activated his overhead lights and Howard started to exit off the freeway. Probable cause to make a traffic stop exists when a defendants commits a traffic violation and a law enforcement officer observes the violation. *United States v. Rosales-Guiron,* 592 Fed. Appx. 246, 251 (5th Cir. 2014). Therefore, this Court finds that Deputy Gonzales had reasonable suspicion and, going further, probable cause to stop Howard for the traffic offense of speeding.[16]

    **C.    Were the law enforcement officer's subsequent actions reasonably related in scope to the circumstances that justified the stop of the vehicle?**

"A stop justified by a traffic violation "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation" and "attend[ing] to related safety concerns," absent reasonable suspicion of additional criminal activity. *Rodriguez v. United States,* __U.S.__, 135 S.Ct. 1609, 1612, 1614-16, 191 L. Ed.2d 492 (2015)(first two alterations in original)(quoting *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)).

Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary

---

[16] The Government also argues that the initial stop was justified due to reasonable suspicion that the pickup's front windows were tinted too darkly under state law. This Court acknowledges that Deputy Gonzales and other officers who were conducting surveillance observed the tinted windows and Deputy Torres testified that he could tell that the tint was too dark when he and Gonzales were attempting to catch up with the pickup. It was also confirmed during the traffic stop that the tint was too dark. However, Deputy Gonzales testified that, as the operator of the patrol car, he pulled Howard over for the offense of speeding because he was not sure about tint being illegally dark.

-13-

inquiries incident to [the traffic] stop." *Id*. Citing *Caballes*, 543 U.S. at 408. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez*, 135 S. Ct at 1615. A warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses. *Id*. Criminal history checks are also permissible and are a negligibly burdensome precaution in order to allow the officer to complete his mission safety. *Id.* at 1616.

Howard argues that Deputy Gonzales impermissibly extended the time needed to complete the mission of the traffic stop to allow time for the drug detection dog to arrive. This Court is unpersuaded by that argument. The record shows that Deputy Gonzales initiated and completed the license plate check on the pickup even before Howard was pulled over. Howard was not questioned extensively by Deputy Gonzales or Deputy Torres before the other record checks were initiated. *Compare United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011)(holding that the officer's extensive questioning unrelated to the purpose and itinerary of the defendant's travels extended the traffic stop and violated the Fourth Amendment). Deputy Gonzales initiated the criminal history check and warrant check through the Harris County database within three minutes after the traffic stop was initiated and continually queried the system, attempting to conclusively identify Howard until he found his arrest record in NCIC/TCIC sixteen minutes into the stop.

Howard argues that Deputy Gonzales should have taken his word about his identity and immediately performed the driver's license check with the name and driver's license number provided by him. However, Deputy Gonzales testified that, in his experience, individuals often provide officers the name and driver's license number of others and that their identity cannot be

confirmed because the driver's license return does not provide a picture like the criminal history check does. This Court finds that it was reasonable for Deputy Gonzales to attempt to locate Howard in the Harris County system and or NCIC/TCIC to positively determine that Howard was indeed the individual he claimed to be. Further, as stated above, Deputy Gonzales had the right to check for warrants and a criminal history pursuant to *Rodriquez*. If there was a delay in running the appropriate records checks, which the Court determines that there was not, the delay was directly attributable to Howard himself due to the fact that he had absolutely no proof of identification on his person, with the exception of credit cards which, of course, had no photograph on them.

>   D.   **Was there reasonable suspicion to detain Howard from the conclusion of the traffic stop at 9:03 p.m. until the time of the dog alert at 9:06 p.m.?**

As stated above, the NCIC/TCIC return came in at 9:03 p.m., and Deputy Gonzales testified that it was at this time that he would have began issuing citations for speeding, failure to identify, and illegal tint. There was no evidence that Deputy Gonzales ever began to issue those citations, nor is there testimony in the record of the amount of time that it would have taken him to do so. Therefore, this Court looks to determine if there was reasonable suspicion to detain Howard for three minutes until the dog alerted on his vehicle at 9:06 p.m.[17]

When making reasonable suspicion determinations, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspected legal wrongdoing. *United States v. Grant,* 349 F.3d 192, 197 (5th Cir. 2003). Officers are allowed to draw on their own experience and specialized training to make inferences

---

[17] This Court notes that the Fifth Circuit has recognized a dog sniff may be reasonably related to the cause of the stop when the initial stop is made on both suspicion of drug activity and a traffic violation. *See United States v. Johnson,* No. 15-10226, 2016 WL 3913427, at *3 (5th Cir. July 19, 2016)(per curiam). However, in this case, Deputy Gonzales was to pull Howard's vehicle over only if he observed a traffic violation. Therefore, this Court looks to see if there was reasonable suspicion of a narcotics offense to detain Howard after the traffic stop was completed.

-15-

from and deductions about the cumulative information available to them that might well elude an untrained person. *Id.*. Courts should err on the side of deferring to the knowledge and experiences of a trained law enforcement officer's ability to distinguish between innocent and suspicious activities. *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Notwithstanding, Fourth Amendment activities are to be judged in the light of objectively justifiable factors, not a law enforcement officer's subjective motives. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 210, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Therefore, the officers involved must be able to articulate something more than just an unparticularized or inchoate hunch. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Although the showing required to demonstrate reasonable suspicion is considerably less than what is necessary to establish probable cause, the Fourth Amendment requires only some minimal level for an officers actions, measured in light of the totality of the circumstances. *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992)(citing *Sokolow*, 490 U.S. at 6-8, 109 S.Ct. 1581). The analysis of reasonableness of factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. *United States v. Ibarra-Sanchez,* 199 F.3d 753, 759 (5th Cir. 1999). Courts should look at the totality of the circumstances to discern whether the officers involved were presented with a "particularized and objective basis" for the suspected wrongdoing. *Arvizu,* 534 U.S. at 273.

The Supreme Court instructs lower courts not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances. *Lopez-Moreno,* 420 F.3d at 433. Reasonable suspicion can develop through the collective knowledge of the officers involves so long as there is some degree of communication between the acting officer and the officer who has knowledge of the necessary facts. *United States v. Ibarra,* 493 F.3d 526, 530 (5th Cir. 2007).

In this case, Deputy Gonzales was informed by other officers of the controlled delivery narcotics operation at the motel and that Howard had left that location and was suspected of possessing illegal narcotics. Deputy Gonzales testified that, at the time of the traffic stop, Howard was extremely nervous to the extent that he was shaking and his lip was quivering. In addition, Deputy Gonzales found it suspicious that Howard had traveled from Crockett, Texas to Houston, Texas to have a windshield replaced. These factors and observations, taken collectively, amount to much more than a "mere hunch" and are specific and articulable facts which made it reasonable for Deputy Gonzales to suspect that criminal activity warranting further investigation was afoot.

This Court also finds that the length of the entire detention was reasonable, given the circumstances of the matter. The reasonableness of the length of detention is judged by "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Brigham,* 382 F.3d 500, 511 (5th Cir. 2004). Deputy Gonzales did not have to wait for a significant amount of time to have his suspicions confirmed or dispelled. Deputy Cline (the K-9 officer) was on standby and arrived on the scene seven minutes after Howard refused to give consent to search and two minutes before Deputy Gonzales located Howard in NCIC/TCIC. The dog alerted to the presence of narcotics at 9:06 p.m., only three minutes after the identity of Howard was confirmed.[18] The entire traffic stop, from start to finish, only lasted nineteen minutes. See *United States v. Pack,* 612 F.3d 341, 361 (5th Cir. 2010)(finding a thirty-five minute detention reasonable in light of the circumstances).

---

[18] A positive alert by a drug detecting dog provides probable cause to search a vehicle. *United States v. Sanchez-Pena,* 336 F.3d 431, 444 (5th Cir. 2003).

## V. Conclusion and Recommendation of the Court

This Court concludes that Deputy Gonzales had probable cause to initiate a traffic stop on Howard's vehicle and did not unreasonably delay the investigation of the traffic offense. This Court further finds that Deputy Gonzales had reasonable suspicion to detain Howard after the traffic stop until the dog alert.

Accordingly, having considered the factors and evidence presented, and based upon the facts and conclusions law stated herein, the undersigned magistrate judge recommends that the District Court **deny** Defendant's *First Motion to Suppress Evidence Seized by Harris County Deputy Sheriffs on March 30, 2016 in Harris County, Texas* [Clerk's doc. #98].

## VI. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within fourteen (14) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within fourteen (14) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir. 1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and

recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 14th day of November, 2016.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE